

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00500-CR

NICOLAS GUADERRAMA                                                       APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1359326D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Nicolas Guaderrama appeals his conviction for possession of more than 400 grams of methamphetamine with intent to deliver. In three issues, Guaderrama argues that the trial court erred by overruling his suppression motion and that the trial court erred by admitting certain evidence and overruling

[1]*See* Tex. R. App. P. 47.4.

his objection to a question concerning that evidence posed by the State to a defense witness at the punishment phase of trial. We will affirm.

## II. BACKGROUND

After being contacted by Monica Caban on the morning of February 7, 2014, police accompanied Caban to a suite located at a Budget Suites extended-stay hotel. Caban told police that she lived in the suite with Guaderrama and that she wished to end her relationship with him and move out but that she feared for her and her children's safety. After Caban invited officers into the suite, police discovered a large amount of methamphetamine. Prior to trial, Guaderrama sought to suppress the methamphetamine.

At the suppression hearing, Guaderrama testified that even though his name was not on the rental agreement for the suite, he and his daughter had lived at the suite for "one or two weeks" prior to the police searching the premises. Guaderrama averred that his name was not on the rental agreement and that instead his friend rented the suite for him. According to Guaderrama, Caban and her two children were his guests. Guaderrama said that the friend who secured the room had also stayed there with him several times. By Guaderrama's account, even though the suite was registered in his friend's name, he paid cash directly to Budget Suites for the suite.

Guaderrama said that Caban and her daughters sometimes stayed in the second bedroom of the suite, which they shared with his daughter. He also

2

testified that Caban and her children had personal belongings in the suite. Guaderrama averred that he and Caban were "going out" with each other and that she had previously lived with him before he moved into the suite. Guaderrama said, however, that Caban had not moved with him to the suite. At one point during his testimony, Guaderrama said that Caban did not live with him there and that she had only stayed a few nights, but later he agreed that he had told the police that Caban lived with him at the suite. At another point during his testimony, Guaderrama stated directly that Caban and her children "were living there."

Demetrio Olvera of the City of Grand Prairie Police Department testified that on February 7, 2014, at roughly 9:00 a.m., he received a phone call to investigate an alleged assault on Caban. Olvera said that he met Caban at a nearby gas station. Olvera averred that Caban reported to him that she was being held against her will by Guaderrama and that he had assaulted her, albeit not physically. Olvera said that Caban referred to Guaderrama as her "live-in boyfriend." Olvera testified that he informed Caban that because there had been no physical assault, she was not being held against her will. Olvera said that Caban then asked him to accompany her to the suite so that she could gather her belongings. He also said that she expressed fear for her safety if she went alone.

3

Olvera said that Caban told him that there were weapons in the suite and also narcotics. Olvera averred that Caban "directed [his] attention to the trunk of [her] car," where she had "placed one of the weapons." Olvera said that Caban told him that she believed that other weapons were in the suite that she lived in with Guaderrama. By Olvera's account, due to Caban's concerns, he agreed to accompany her to the suite so that she could gather her things. Olvera said that when he, Caban, and a fellow officer arrived at the suite, Caban stood at "the threshold" of the suite and invited the two officers in. According to Olvera, Caban made it very clear that she possessed the right to consent to their entry into and search of the premises. Olvera said that once he was inside, he saw personal belongings consistent with Caban's story that she lived there. Olvera said that after they entered the premises, they found Guaderrama asleep in one of the two bedrooms. By Olvera's account, Guaderrama also consented to the other officer's request to search the premises for weapons. Olvera said that Guaderrama consented to a search of the "entire apartment, not just a specific location." Olvera said that at no time did Guaderrama ask that the officers stop their search. Olvera said that in a cabinet above the refrigerator, the officers found a "clear plastic" container that they believed contained narcotics. The substance later proved to be methamphetamine. The State introduced photographs of the container as it was found inside the cabinet above the refrigerator.

4

Guaderrama retook the stand and testified that the only question he remembered being asked by the police was whether there were any guns inside the suite, to which he responded, "No."

The trial court also had before it a videotape of the police interviewing Caban after the search of the suite. In the video, Caban can be heard telling the interviewing officer that she and her two children had previously lived with a mutual friend of Guaderrama and hers. Caban said that she and Guaderrama began to date several months before she contacted the police and that eventually the couple began living together, mostly in extended-stay hotels. Caban told the interviewing officer that she and Guaderrama had specifically selected that Budget Suites' suite because it contained two bedrooms, which provided enough living space to accommodate herself and her two children as well as Guaderrama and his daughter. By Caban's account, part of the living arrangement was that Guaderrama would pay for the suite and Caban would care for the three children, including taking them to and from school. Caban said that the five of them had lived in the Budget Suites' suite for the two weeks prior to her calling the police. Caban also told the interviewing officer that Guaderrama had purchased a car in her name.

Caban said that she called the police on the morning of the search because she feared for her and her children's safety. According to Caban, Guaderrama had arrived in the early morning hours intoxicated and had

threatened her. Caban said that because she knew that Guaderrama would be passed out due to the time and manner in which he had arrived earlier that morning, she felt that it was the right time to contact police after she had taken the children to school. Caban said that she had the authority to grant police consent to enter and search the suite because she and her children lived there and because her belongings were there.

The trial court denied Guaderrama's suppression motion. In its findings of fact and conclusions of law, the trial court concluded that both Caban and Guaderrama had the right to consent to search the premises, that Caban had lawfully invited the officers to enter the premises, and that Guaderrama had consented to a search.

Later, a jury found Guaderrama guilty of possession of methamphetamine with the intent to deliver in the amount of more than 400 grams. The jury assessed punishment at forty years' confinement. The trial court entered judgment accordingly, and this appeal followed.

### III. DISCUSSION

#### A.    Caban's Consent to Enter the Suite

In his first issue, Guaderrama argues that the trial court erred by overruling his motion to suppress. Specifically, Guaderrama argues that the trial court erred by finding that Caban possessed the authority to grant police consent to enter the

6

Budget Suites' suite and that thus anything they found therein should have been suppressed. We disagree.

### 1. Standard of Review and Warrantless Searches

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those

7

questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly,* 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young*

8

*v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App.), *cert. denied*, 558 U.S. 1093 (2009).  A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant.  *Amador*, 221 S.W.3d at 672.  Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable.  *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Whether a search is reasonable is a question of law that we review de novo.  *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). Reasonableness is measured by examining the totality of the circumstances.  *Id.* at 63.  It requires a balancing of the public interest and the individual's right to be free from arbitrary detentions and intrusions.  *Id.*  A search conducted without a warrant is per se unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant requirement.  *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1004 (2003); *see Best*, 118 S.W.3d at 862.

### 2.    Warrantless Entry Was Consensual

Consent to entry is one of the well-established exceptions to the warrant requirement.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *see Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App.

2011); *Johnson v. State*, 226 S.W.3d 439, 443–47 (Tex. Crim. App. 2007). A party may properly consent to a search when she has control over and authority to use the premises being searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974); *Balentine v. State*, 71 S.W.3d 763, 772 (Tex. Crim. App. 2002). Where co-tenants or joint occupants live at a residence, either tenant may give law enforcement officers consent to search the premises so long as that tenant has control over and authority to use the premises. *Johnson v. State*, No. 04-10-00892-CR, 2011 WL 4477786, at *3 (Tex. App.—San Antonio Sept. 28, 2011, no pet.) (mem. op., not designated for publication); *Jones v. State*, 119 S.W.3d 766, 787 (Tex. Crim. App. 2003). The State has the burden of establishing common or apparent authority. *Illinois v. Rodriguez*, 497 U.S. 177, 186–89, 110 S. Ct. 2793, 2800–01 (1990); *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011).

Here, viewing the evidence in the light most favorable to the trial court's finding that Caban possessed control over and authority to use the suite, the facts demonstrate that she had authority to consent to entry of the premises. Even though Guaderrama provided conflicting testimony that Caban was a guest versus someone who lived in the suite, the resolution of that conflict was within the trial court's province. *See Ervin v. State*, No. 05-01-01325-CR, 2002 WL 1494815, at *3 (Tex. App.—Dallas July 15, 2002, no pet.) (not designated for publication) (holding that "record contain[ing] conflicting testimony about consent"

10

is to be resolved in favor of trial court's suppression ruling). Moreover, it is significant that there is no evidence that Guaderrama, found by the trial court to be a co-tenant of the suite with Caban, ever objected to the officers' entry into the suite or their subsequent search. *See Woolverton v. State*, 324 S.W.3d 794, 799–800 (Tex. App.—Texarkana 2010, pet ref'd) (holding that where testimony established that defendant did not object to entry and search of apartment based on co-tenant's consent, entry and search were valid). In fact, at the suppression hearing, the only disputed element of Guaderrama's consent was its scope and whether he had consented to a search for weapons only or to an unlimited search, but there is zero evidence that he objected to the entry based on Caban's consent.

Furthermore, the trial court had before it a videotaped interview of Caban explaining to the interviewing officer that she lived at the suite; that she had lived there with Guaderrama for the previous two weeks; that her children lived there; that her and her children's belongings were there; and that she and Guaderrama had a specific living arrangement in which she would take the couple's children to school and babysit them in lieu of Guaderrama paying the costs for the two-bedroom suite, a suite that the trial court heard evidence had been specifically chosen by the couple to house them and their collective children. Moreover, the trial court heard evidence that once the officers were inside, they were able to

corroborate Caban's story that she lived in the suite and that her belongings were there.

We hold that the trial court did not err by finding that Caban possessed control over and authority to use the suite, and thus the trial court did not err by concluding that she had lawfully consented to the officers' entry.  *See Jones*, 119 S.W.3d at 788 ("Freeman shared mutual use of her house with appellant such that she had authority to grant consent to a search of the entire house."); *see also Hawkins v. State*, 968 S.W.2d 382, 385 (Tex. App.—Tyler 1997, pet ref'd) (holding that consent given by defendant's live-in girlfriend to search apartment entitled officers to enter apartment twice).  We overrule Guaderrama's first issue.

## B.    Admission of Identification Card

In his second and third issues, Guaderrama argues that the trial court erred by allowing the State, during punishment, to introduce an identification card and then to elicit testimony from a defense witness, who testified that the identification card bore Guaderrama's photograph but that the card bore the name "Victor Ortiz Trejo."  At trial, Guaderrama objected to the admission of the identification card on the basis of relevancy; that the card was not "properly linked" to Guaderrama; and "to authentication as well."  Guaderrama also objected at trial that the identification card had not been linked to him when the State questioned the defense witness regarding whether the witness was aware that Guaderrama used an alias and possessed an identification card under a

different name. Now on appeal, Guaderrama argues that admission of the identification card into evidence was improper because it was not properly authenticated and because it was not relevant.

We agree with the State that to the degree that Guaderrama brings an authentication complaint regarding the identification card, he has forfeited this argument for our review because his general authentication objection at trial was an "improper authentication objection . . . that, without more, is inadequate to preserve the complaint on appeal." *Trotty v. State*, No. 02-12-00537-CR, 2014 WL 2538806, at *3 (Tex. App.—Fort Worth June 5, 2014, no pet.) (mem. op., not designated for publication) (*citing Smith v. State*, 683 S.W.2d 393, 404 (Tex. Crim. App. 1984)).

Furthermore, we agree with the State that Guaderrama's objection at trial to the State's question regarding whether the witness was aware of the identification card does not comport with his complaint that he now brings on appeal, that the State assumed facts not in the record when it asked its question. Thus, Guaderrama has forfeited this objection for our review. *See Miller v. State*, 333 S.W.3d 352, 356 (Tex. App.—Fort Worth 2010, pet. ref'd) ("[W]hen the objection made in the trial court does not comport with the argument made on appeal, the appellant fails to preserve the argument for our review.").

Concerning his relevancy complaint regarding admission of the identification card, Guaderrama argues that "the State failed to demonstrate that

13

[the identification card] had any relevance in this case" and that the trial court therefore erred by allowing it to be introduced into evidence. We disagree.

We review a trial court's decision to admit evidence for an abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App.), *cert. denied*, 934 S.W.2d 92 (1996). If the trial court's decision falls within the zone of reasonable disagreement, that decision will not be disturbed. *Id.*

Generally, irrelevant evidence is not admissible. Tex. R. Evid. 402. But evidence of extraneous offenses or bad acts is admissible during the punishment phase of trial as relevant to the jury's assessment of punishment. *See* Tex. Code Crim. Proc. art. 37.07 § 3(a)(1). Furthermore, if a defendant brings his character into issue by introducing character evidence, the State may offer rebuttal character evidence. Tex. R. Evid. 405.

Here, the defense offered testimony from one of Guaderrama's former employers that Guaderrama was a great father who possessed a "[g]reat work ethic" and who, to the witness's knowledge, had never committed a felony prior to this conviction. The witness further testified that Guaderrama had made a "mistake" that was out of his character when he chose to possess the more than 400 grams of methamphetamine. In response, the State introduced the identification card in question and elicited testimony from the same witness demonstrating that Guaderrama possessed a false Mexico consular identification card and that the witness was aware that Guaderrama had entered the United

14

States from Mexico illegally. *See* 8 U.S.C. § 1325(a) (improper entry by an alien); 18 U.S.C. § 1028(a)(4) (2006) (possession of fraudulent identification). Thus, the trial court did not abuse its discretion by allowing the State to introduce the identification card and elicit testimony pertaining to it as rebuttal character evidence. Moreover, the trial court was also within its discretion to allow this evidence as relevant to the jury's assessment of punishment. *See* Tex. Code Crim. Proc. art. 37.07 § 3(a)(1). We overrule Guaderrama's second and third issues.

## IV. CONCLUSION

Having overruled all three of Guaderrama's issues, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

GABRIEL, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 3, 2016